## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBIN MITTASCH as Trustee, Companion Animal Trust for the Benefit of Stella Blue and Tazzy, *ex rel.* "STELLA BLUE" and "TAZZY," dogs, <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER STEVEN K. REVICZKY, individually and in his official capacity, ACO SUPERVISOR RAYMOND T. CONNORS, individually and in his official capacity, ACO LINDA WENNER, individually and in her official capacity, TOWN OF COLCHESTER, COLCHESTER FIRST SELECTMAN GREGG B. SCHUSTER, individually and in his official capacity, STATE POLICE SGT. MARC PETRUZZI, individually and in his official capacity, AND JOHN DOES 1-2, <br><br> Defendants. | No. 3:12-cv-01200 (MPS) |

## MEMORANDUM OF DECISION

The Plaintiff in this lawsuit, Robin Mittasch, is the trustee of an "animal trust" purportedly established under New York law for the benefit of two Rottweiler dogs owned by an individual who is not a party to this lawsuit. The lawsuit alleges constitutional violations arising from the seizure and detention of the two dogs by municipal and state authorities after one of the dogs "nipped" a police officer during a confrontation at the dog owner's home. The "animal trust," the property of which consists of $100 to be used for the dogs' care, was created eight months after the dogs were seized and ten days before this lawsuit was filed. There is no evidence in the record that the Plaintiff has ever possessed, cared for, or laid eyes on the two dogs. Under these circumstances, this Court would exceed a basic limit on its powers if it reached the merits of this dispute. That limit – which springs from the language of Article III of

the Constitution extending federal judicial power to "Cases" and "Controversies" – is the requirement that each party invoking the jurisdiction of a federal court have standing to do so. The Plaintiff does not have standing because she has failed to establish that the seizure and detention of the dogs has caused her to suffer any injury.   The Court therefore grants the Defendants' Motions to Dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure, and directs the Clerk to close this case.  All other pending motions are denied as moot.

## I.      Background

The facts are taken from the complaint and other documents in the record.[1]

### A.       Disposal Order and Appeal Hearing

Michelle Chapman-Avery, who is not a party to this action, is the owner of two Rottweiler dogs named Stella Blue and Tazzy.  (Compl. [Dkt. # 1] at Preliminary Statement, ¶ 12.)  On December 19, 2011, Ms. Chapman-Avery was arrested while on her property in Colchester, Connecticut.   (Investigation Report [Dkt. # 44-2].)   During that arrest, two Colchester police officers arrived at her home, and one opened the screen door of the house. (Compl. ¶ 16.)  The two dogs exited the house, and one of them, Stella Blue, "nipped" one of the officers.   (*Id.* ¶¶ 19-20.)   Although neither dog was removed from Ms. Chapman-Avery's property on December 19, 2011, the Town of Colchester later issued a "Disposal Order" for Stella Blue under Conn. Gen. Stat. § 22-358.[2]  (Disposal Order, Ex. D [Dkt. # 22-1].)  Stella Blue was then taken, quarantined, and held by the Town of Colchester.[3]  (Compl. ¶ 25.)

---

[1] "In adjudicating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), courts may consider evidence outside the pleadings."  *Remy v. N.Y. State Dep't of Taxation & Fin.*, No. 11-1921, 2013 U.S. App. LEXIS 61, at *3 (2d Cir. Jan. 3, 2013) (internal quotation marks omitted).

In January 2012, Ms. Chapman-Avery requested a hearing to appeal the Disposal Order, as permitted by Conn. Gen. Stat. § 22-358.  (Hr'g Request, *In re "Stella Blue"* (Conn. Dep't of Agric. Jan. 13, 2012), Ex. E [Dkt. # 22-1].)  On June 22, 2012, the Department of Agriculture provided notice to Ms. Chapman-Avery of a hearing scheduled for August 1, 2012, which was then rescheduled to August 28, 2012.  (Notice of Hr'g, *In re "Stella Blue"* (Conn. Dep't of Agric. June 22, 2012), Ex. H [Dkt. # 22-1]; Rescheduling of Hr'g, *In re "Stella Blue"* (Conn.

---

[2] Conn. Gen. Stat. § 22-358(c) provides, in pertinent part, as follows:

> The commissioner, the Chief Animal Control Officer, any animal control officer, any municipal animal control officer or any regional animal control officer may make any order concerning the restraint or disposal of any biting dog, cat or other animal as the commissioner or such officer deems necessary. …  Any person aggrieved by an order of any municipal animal control officer, the Chief Animal Control Officer, any animal control officer or any regional animal control officer may request a hearing before the commissioner within fourteen days of the issuance of such order. Any order issued pursuant to this section that requires the restraint of an animal shall be effective upon its issuance and shall remain in effect during any appeal of such order to the commissioner. After such hearing, the commissioner may affirm, modify or revoke such order as the commissioner deems proper.

[3] The Complaint alleges that Tazzy also was removed from Ms. Chapman-Avery under the Disposal Order.  (Compl. ¶¶ 23, 25.)  It appears, however, that Ms. Chapman-Avery was ordered by the Connecticut Superior Court to surrender Tazzy as a part of the criminal proceedings related to her arrest, not as a result of the disposal order.  (*See* Court Order, *Connecticut v. Avery*, Dkt. No. K21N-CR11-01117140-S (Conn. Super. Ct. Jan. 4, 2012), Ex. B to Compl. [Dkt. # 1-2]; Disposal Order.)  This discrepancy does not affect the outcome here. According to the Complaint, Tazzy was released immediately before the filing of this action; the Complaint alleges that Tazzy's health suffered while he was in custody.  (Compl. at Preliminary Statement.)

Dep't of Agric. Aug. 6, 2012), Ex. I [Dkt. # 22-1].)[4]  Stella Blue remained in the custody of the Town of Colchester pound as of the filing of this lawsuit.  (Compl. ¶ 30.)

### B.    Creation of the Trust

On August 7, 2012, ten days before this lawsuit was filed, Ms. Chapman-Avery purportedly created a "Companion Animal Trust for the Benefit of Stella Blue & Tazzy" (the "Trust") under New York Estates, Powers, and Trusts Law ("EPTL") § 7-8.1.[5]  (Trust [Dkt. # 1-1] at 1.)  The Trust identifies Ms. Chapman-Avery as "grantor," Plaintiff Robin Mittasch, President of The Lexus Project, Inc., as "trustee," and Richard Bruce Rosenthal, General Counsel of The Lexus Project, Inc., as "trust protector."  (*Id.* at 1, 4.)[6]  Ms. Chapman-Avery, as grantor, transferred to the Plaintiff, as trustee, only "the property set forth in Schedule A," specifically

---

[4] At Ms. Chapman-Avery's request, the Department later rescheduled the hearing.  (Aug. 20, 2012 Request, *In re "Stella Blue"* (Conn. Dep't of Agric. Aug. 20, 2012), Ex. J [Dkt. # 22-1]; Rescheduling of Hr'g, *In re "Stella Blue"* (Conn. Dep't of Agric. Sept. 12, 2012), Ex. K [Dkt. # 22-1].)  The hearing was ultimately held on November 2 and 21, 2012, and in a final decision on February 28, 2013, the Department returned Stella Blue to Ms. Chapman-Avery and required her to complete an obedience class with the dog, confine the dog in her yard, and comply with other restrictions.  (Final Decision at 5-6, *In re "Stella Blue"* (Conn. Dep't of Agric. Feb. 28, 2013)); *see Hohmann v. GTECH Corp.,* No. 3:09-cv-00410, 2012 U.S. Dist. LEXIS 174421, at *5 (D. Conn. Dec. 10, 2012) ("The matters of which a court may take judicial notice include the decisions of an administrative agency.")  The Plaintiff at one point sought to intervene in the hearing but the Department denied her request, finding that the Plaintiff lacked an interest in the dogs.  (Decision on Pet. To Intervene as Party, *In re "Stella Blue"* (Conn. Dep't of Agric. Sept. 18, 2012) [Dkt. # 15-9] at 2).)  Because all of these events occurred after this action was filed, the Court does not rely on them in determining whether the Plaintiff has standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.").

[5] EPTL § 7-8.1(a) provides that "[a] trust for the care of a designated domestic or pet animal is valid.  The intended use of the principal or income may be enforced by an individual designated for that purpose in the trust instrument or, if none, by an individual appointed by a court upon application to it by an individual, or by a trustee.  Such trust shall terminate when the living animal[,] beneficiary[,] or beneficiaries of such trust are no longer alive."

[6] "The Lexus Project, Legal Defense for All Breeds" describes itself as a § 501(c)(3) organization devoted to the welfare of dogs.  *See* The Lexus Project, http://thelexusproject.org/index.php (last visited June 5, 2013).

"$100 Cash." (*Id*. at 1, Schedule A.) The dogs, Stella Blue and Tazzy, were not designated as part of the Trust property, but instead are the named "Beneficiaries." (*Id.*)

In addition to requiring the trustee to use the "income and principal of the Trust Estate" to "pay for the expenses of the care of the Beneficiaries," the Trust provides that the "trustee may act as caretaker of the animals, or the trustee may find a caretaker for the Beneficiaries, and place the Beneficiaries with such caretaker." (*Id*. at 2.) The trustee also "has the right to name a guardian for the Beneficiaries" or, "[i]f the trustee determines that it would be in the best interests of the Beneficiaries to be placed with an adoptive family, the trustee has the right to place the Beneficiaries in such home." (*Id*.) Finally, the "trustee has the right to defend or prosecute claims or causes of action on behalf of the Beneficiaries, and the trustee is to use funds from the trust to protect and defend the dog if any lawsuits arise that would jeopardize the dog's life and/or freedom." (*Id.*)

At the time the Trust was purportedly created, neither Ms. Chapman-Avery nor Ms. Mittasch had possession of Stella Blue or Tazzy, which were being kept by the Town of Colchester and a third party, respectively. (*See* Final Decision at 2-3, *In re "Stella Blue"* (Conn. Dep't of Agric. Feb. 28, 2012) (noting that Stella Blue "has been in the Town of Colchester animal shelter from December 19, 2011, to present," i.e., the time of the decision); Court Order, *Connecticut v. Avery*, Dkt. No. K21N-CR11-01117140-S (Conn. Super. Ct. Aug. 6, 2012) (noting that Tazzy was ordered to be surrendered on January 4, 2012 and was released to a third party on August 6, 2012).) After Tazzy was released by order of the Connecticut Superior Court on August 6, 2012, neither Ms. Chapman-Avery nor Ms. Mittasch took possession of the dog. Instead, Tazzy was released to a third party, Joy Scott. (*See* Court Order, *Connecticut v. Avery*, Dkt. No. K21N-CR11-01117140-S (Conn. Super. Ct. Aug. 6, 2012)).

5

### C.    Commencement of this Action

On August 17, 2012, Ms. Mittasch, as trustee, commenced this action alleging constitutional violations related to the seizure and holding of the dogs,[7] as well as the hearing procedure set forth in Conn. Gen. Stat. § 22-358.   The Plaintiff's Complaint names as defendants:  (1) Stephen K. Reviczky, Commissioner of the Connecticut Department of Agriculture; (2) Animal Control Supervisor Raymond T. Connors; (3) Animal Control Officer Linda Wenner; (4) the Town of Colchester; (5) Gregg B. Schuster, First Selectman for the Town of Colchester; (6) Mark Petruzzi, Sergeant, Municipal Animal Control, Colchester Police Department; and (7) John Does 1-2, employees or former employees of the Municipal Animal Control, Colchester Police Department (collectively, "Defendants").  (Compl. ¶¶ 3-8.)   Ms. Mittasch alleges that Conn. Gen. Stat. § 22-358 is "overbroad, vague, and facially and as applied unconstitutional" because it permits the dogs to be "arbitrarily, capriciously, illegally, and unconstitutionally deprived from the Trust."   (*Id.* at Preliminary Statement.)   Ms. Mittasch claims that the Defendants have violated her Fourth, Fifth, Sixth, and Fourteenth Amendment rights, as well as "one or more State laws." (*Id.*)   In addition to monetary damages, the return of Stella Blue, and a declaration that Conn. Gen. Stat. § 22-358 is unconstitutional, Ms. Mittasch seeks to enjoin the Defendants from holding any hearings whatsoever under § 22-358.   (*Id.* at Prayer for Relief.)

The Defendants have moved to dismiss this action on various grounds under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), including on the basis that the Plaintiff lacks standing.  The Court need only address standing to resolve this action.

---

[7] The Plaintiff later filed a proposed amended complaint in which she sought to drop her claims concerning Tazzy.  (*See* Proposed Am. Compl. [Dkt. # 62-1].)

## II.     Discussion

### A.     Legal Standard

In considering a motion to dismiss, whether brought under Fed. R. Civ. P. 12(b)(1) or 12(b)(6), the Court must accept as true all well-pleaded facts in the Plaintiff's complaint and draw all reasonable inferences in favor of the Plaintiff.  *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009) ("[I]n reviewing the grant of a motion to dismiss under Rule 12(b)(1) we must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the Plaintiff's favor.").  When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, the Court may consider materials outside the complaint.  *See Remy*, 2013 U.S. App. LEXIS 61, at *3.

### B.     The Plaintiff Lacks Standing

"Article III, Section 2 of the Constitution limits the subject matter jurisdiction of the federal courts to the resolution of cases and controversies."  *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 228 (2d Cir. 2012) (internal quotation marks omitted).  Indeed, "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases and controversies."  *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1146 (2013).  To ensure that the case or controversy requirement is met, "plaintiffs must establish that they have standing to sue."  *Id.* (internal quotation marks omitted).  Standing is critical because it "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Id.* at 1146.

"To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that they have standing to sue."  *Kiryas Joel Alliance v. Vill. Of Kiryas Joel*, 495 Fed. App'x 183, 188 (2d Cir. 2012) (internal quotation

marks omitted).  To establish standing, a plaintiff must demonstrate: "(1) *injury-in-fact*, which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (internal quotation marks omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Clapper*, 133 S. Ct. at 1147 ("To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." (internal quotation marks omitted)).

The Defendants contend that the Plaintiff has not suffered injury-in-fact because the harm alleged concerns the dogs, not the $100 Trust property, and because the Plaintiff lacks a property interest in the dogs.  (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Rule 12(b)(1) [Dkt. # 20] at 7-8.)  The Court looks to state law to assess the adequacy of a property interest asserted as the basis for standing.  *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 317 (2d Cir. 2002) ("In determining whether a particular property interest rises to the level of constitutional protection, a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of that right." (internal quotation marks omitted)).  That is because "[w]hile property interests are constitutionally protected, they are not generally constitutionally *established*; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law…."  *Brunell v. Clinton Cnty.*, 334 Fed. App'x 367, 369 (2d Cir. 2009) (emphasis in original).

### 1.     The Plaintiff Lacks a Property Interest in the Dogs

Assuming the Trust is valid under state law, *but see infra* Section II.B.2 (discussing the validity of the Trust), the Court must consider whether the Plaintiff has standing to assert the claims set forth in the Complaint based on the Trust terms, basic principles of trust law, and her actions as trustee.  The Court concludes that she does not.

A trust "is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee."  Restatement (Third) of Trusts § 2 (2003); *see Mercury Bay Boating Club, Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 289 (1990) (citing the Restatement of Trusts for "settled principles of trust law").  The Restatement defines the components of a trust as follows: "[t]he person who creates a trust is the settlor [or 'grantor']," "the property held in trust is the trust property," "[t]he person who holds property in trust is the trustee," and "[a] person for whose benefit property is held in trust is a beneficiary."  *Id.* § 3 & cmt. a.[8]  Superimposed on the facts of this case, those definitions make Ms. Chapman-Avery the grantor, Ms. Mittasch the trustee, $100 the trust property, and the two dogs the beneficiaries.

As trustee, the Plaintiff does not "own" the beneficiaries of the trust.  Rather, she has title – and legal title only – to the $100 and any income it generates, which is the only property the Trust purports to convey to the trustee.  The beneficiaries – the dogs – are the equitable owners of the Trust property, an equitable interest that may, under the New York statute, be enforced by the "trust protector," Mr. Rosenthal.  *See* EPTL § 7-8.1 ("The intended use of the principal or

---

[8] EPLT § 7-8.1, the New York statute under which the trust at issue here was purportedly created, does not interfere with these basic notions of trust law.

income may be enforced by an individual designated for that purpose in the trust instrument….").

The Plaintiff ultimately acknowledges that she does not own the dogs, but she claims that she has a "possessory interest" or other "property interest" in the dogs.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (hereinafter "Pl.'s Br.") [Dkt. # 37] at 2, 13 ("The Trust is *considered* an 'owner or keeper' of Stella Blue" and "[i]f not technical 'ownership' as a matter of semantics, the Plaintiff clearly has rights to possession, use, and alienation." (emphasis added)).)  There is no suggestion, however, in the Complaint or any of the other materials the Court might consider on a Rule 12(b)(1) motion, that the Plaintiff has ever had possession of the dogs.  When the Trust was created, the two dogs were being held not by the Plaintiff or even by their owner, Ms. Chapman-Avery, but by the Town and a third-party.  Even after one of the dogs, Tazzy, was released to the third party, the Plaintiff made no attempt to care for or take custody of that dog – at least from all that appears in the materials before the Court.  Because there is no evidence that the Plaintiff has ever possessed the dogs, her argument that she is a "keeper" of the dogs under Connecticut statutes also fails.  *See* Conn. Gen. Stat. § 22-327(6) (defining "keeper" as "any person, other than the owner, harboring or having in his possession any dog").[9]

Further, while the Complaint includes vague – and contradictory – allegations about whether the Trust has ever incurred any expenses related to the dogs' care (*compare* Compl. ¶ 33 (alleging that the Trust and the Plaintiff "are in fact incurring expenses charged by the Defendants for their 'care' of the dogs") *with id*. ¶¶ 53, 57 (alleging that while dogs are detained under Conn. Gen. Stat. § 22-358, "the *owners* are charged for the costs related to care of the dog

---

[9] The Plaintiff has submitted no evidence that she has "harbored" the dogs either, i.e., no evidence that she has "give[n] shelter to" the dogs or "provide[d them] with … temporary quarters." Am. Heritage Dictionary, Second College Edition (definition of "harbor").

taken by the Defendants" (emphasis added))), the Plaintiff has not alleged facts indicating that she has expended any monies of the Trust to care for the dogs, as a result of the Defendants' actions or otherwise.  And she made no effort to defend her standing on this ground in her brief in opposition to the Defendants' Motions to Dismiss.  In any event, Connecticut law permits municipal authorities holding a dog under the challenged statute to charge only the "*owner or keeper*" of the dog for the animal's care.  Conn. Gen. Stat. § 22-333 ("The owner or keeper of any dog, cat or other animal impounded for the purposes of quarantine, as set forth in sections 22-358 and 22-359, shall pay the amount determined by the municipality to be the full cost of detention and care of such quarantined animal.")  The Defendants' detention of the dogs under § 22-358 has imposed no costs on the Plaintiff or the Trust, because the Plaintiff is not the owner or keeper of the dogs.

Nor is there any suggestion in the record that the Plaintiff has attempted to place either of the dogs for adoption, find a caretaker for them, or name a guardian for them.  Further, unlike the dogs' owner, Ms. Chapman-Avery, the Plaintiff did not even request a hearing before the Commissioner of Agriculture with respect to the seizure of the dogs before the filing of this action.[10]  Indeed, there is nothing in the record to suggest that the Plaintiff took any action of any kind related to the dogs in the ten days between the creation of the Trust and the filing of this lawsuit.  From all that appears in the record, the Plaintiff has never even laid eyes on the dogs. There is, in short, no evidence – or even an allegation – suggesting that the Plaintiff has ever sought to exercise dominion or control over the dogs.

---

[10] The Trust did not exist more than ten days before the filing of this action – which, as Defendants point out (*see* State Defs.' Mem. of Law in Supp. of Mot. to Dismiss [Dkt. # 43] at 9) makes it hard to conceive how the Plaintiff could possibly have standing to challenge the actions of the Defendants that occurred before the Trust was created, i.e., the seizure and the detention of the dogs for the first eight months.

This case is thus a far cry from the cases the Plaintiff relies on for her claim of a "possessory interest," all of which involved plaintiffs who had exercised some dominion or control over the property of which they were deprived.  *See Andrus v. Allard*, 444 U.S. 51, 65 n.21 (1979) (in a challenge to a federal law restricting the sale of protected bird artifacts, holding that the plaintiffs had standing because they possessed the bird artifacts and "the regulation they challenge restricts their ability to dispose of their property," and noting that there would be "no standing to assert a takings claim by those who are merely employed in selling artifacts owned by others"); *Pangburn v. Culbertson*, 200 F.3d 65, 69–70 (2d Cir. 1999) (in a forfeiture case, holding that although the plaintiff was not the "record owner" of a car, the fact that he used and drove the car provided him with a "significant property interest" sufficient to bring a claim under § 1983 for deprivation of property without due process); *Murphy v. Buonato*, 42 Conn. App. 239, 244 (1996) (holding that the plaintiff was a "keeper" of a dog for purposes of liability where the plaintiff had sole possession of dog, allowed it to live at his residence, fed and sheltered the dog, and accepted full responsibility for its care).[11]

The Plaintiff's reliance on the language in the Trust concerning care of the dogs, placement for adoption, and authority to bring suit is similarly misplaced, as none of these powers creates a possessory interest sufficient to create standing.  (*See* Pl.'s Br. at 15-16.)  The language concerning care of the dogs provides as follows: "The trustee may act as caretaker of the animals, or the trustee may find a caretaker for the Beneficiaries, and place the Beneficiaries

---

[11] The Plaintiff also suggests that she has a possessory interest because she is a bailee of the dogs.  (Pl.'s Br. at 14.)  That is not so.  First, the Plaintiff is not a bailee because she has never had possession of the dogs.  *See Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 420 (2007) ("In bailment, the owner or bailor has a general property interest in the goods bailed…. The bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment.").  Second, trusts are not bailments.  *See* Restatement (Third) of Trusts § 5 (2003) ("The following are not trusts: … (f) bailments and leases….").

with such caretaker." (Trust at 2.) This language makes clear that there is no expectation that the Plaintiff herself will actually care for the dogs: she "may act as caretaker" or she may "find" someone else to play that role – and, as noted, there is no evidence in the record she has attempted to perform either task. Further, the Trust purportedly allows the Plaintiff, as trustee, to appoint someone else to serve as a "guardian" for the dogs – something she also has apparently not done. It is thus clear that the Trust itself does not make the trustee the guardian of the animals. *See also* Restatement (Third) of Trusts § 5 (2003) ("The following are not trusts: … (c) guardianships and conservatorships."). In short, nothing in the Trust requires the Plaintiff to do anything that would actually entail taking possession of the dogs. All the Trust requires the Plaintiff to do is to safeguard the Trust property – $100 – and use it for the dogs' expenses. That duty does not create a possessory interest in the dogs themselves.

Further, the language in the Trust purporting to give the Plaintiff "the right to place" the dogs for adoption is of questionable effect. While trustees have power over trust property – here, the $100 – they do not have power over the trust beneficiaries themselves – here, the dogs. The Trust provisions allowing the trustee to appoint a caretaker and guardian suggest that the grantor intended to ensure that a caretaker/guardian would make decisions about the best interests of the dogs themselves while the Plaintiff, as trustee, would manage the Trust property for their benefit. Such a separation of control over the person of the ward and the property of the ward is well recognized. *See* Unif. Guardianship & Protective Proceedings Act, Summary (1998) (distinguishing "conservators," who "are appointed to receive, invest, manage, and disburse property held for a minor or an incapacitated person," are "always appointed by an appropriate court," and "are like trustees of a trust and are fiduciaries, who must receive, invest, manage and disburse property in the interests of the protected person, " from "guardians," who "may be

appointed to care for unemancipated minors (children) who have lost their parents to death or incapacitation or for whom parental authority has been legally terminated," who "may also be appointed to care for adults who have become incapacitated and who cannot, therefore, take care of themselves," and who "care for the person, who is called a ward, under the UGPPA"); *see also, e.g.*, *Vreeland v. Marshall*, 584 So.2d 809, 810 n.1 (Ala. 1991) (noting that the Alabama Uniform Guardianship and Protective Proceedings Act "recognize[s] two fiduciary capacities— namely, that of a 'guardian,' who is 'of the person' and analogous to a parent, and that of a 'conservator,' who is 'of the property' and more closely analogous to a trustee"). Here, the Plaintiff is not the guardian of the dogs and is not, by virtue of her status as trustee of the trust property, required to care for them or take custody of them. And, as noted, she has never had possession of the dogs. It is, therefore, doubtful that the Trust vests her with a right to place the dogs for adoption that would be enforceable against, say, a guardian (were one appointed), a caretaker or keeper, or the owner's heirs. Placed in context, the bare language allowing her to place the dogs for adoption is likely a nullity and does not give her a property interest in the dogs.

Finally, the language in the Trust purporting to confer "the right to defend or prosecute claims or causes of action on behalf of the Beneficiaries" (Trust at 2), and the power to "commenc[e], defend[], interven[e] in and/or maintain[] any litigation regarding Stella Blue & Tazzy" (*id.* at 6), does no more to create standing than language that said, for example, that "the trustee shall have Article III standing in any litigation concerning the dogs." Standing is not a matter of the parties' intent, and it does not arise by *ipse dixit*. *See United Capital Corp. v. 183 Lorraine St. Assocs.*, No. 95-5101, 1996 U.S. App. LEXIS 12335, at *2 (2d Cir. May 29, 1996) (holding that "standing cannot be conferred by agreement of the parties" and that "[i]f a party has

no legally cognizable injury, the federal court lacks jurisdiction"). It is a matter of the Court's jurisdiction and hinges on the existence of a concrete injury. *See id*; *see also Lujan*, 504 U.S. at 560. In this case, there can be no injury absent some property interest in the dogs, and the Plaintiff has shown none.

### 2.    The Trust Is Not Valid Under State Law

The Court also finds that the Plaintiff lacks standing because any property interest she might have would arise from the Trust, and the Trust is not valid under New York law.

At common law, trusts for the care of animals were invalid because they could not be enforced and because they violated the Rule Against Perpetuities. *See In re Will of Hamilton*, 57 N.Y.S.2d 359, 362-63 (N.Y. Sur. Ct. 1945). At most, such "trusts" were considered to empower, but not to require, the trustee to provide for the care of the animals. (*See* Sponsor's Mem. Bill Jacket, L. 1996, ch. 159 (noting that prior to 1996, "New York State law does not allow a pet owner to leave any part of his or her estate directly to benefit an animal"; rather, "a pet owner may only leave a sum of money to a person, along with a *request* that the money be used for the pet's care.") (emphasis added).)   The case law so holding dealt with attempts to create testamentary trusts, i.e., to provide for the care of the owner's pets after his or her death. *See, e.g., In re Mills' Estate*, 111 N.Y.S.2d 622, 625 (N.Y. Sur. Ct. 1952) (invalidating a pet trust created in a will because it measured the life of the trust by the lives of animals and not human beings, contrary to the Rule Against Perpetuities).

In 1996, New York adopted EPTL § 7-6.1, later renumbered as EPTL § 7-8.1, to address the problem arising from this line of cases. The statute provides that, "[a] trust for the care of a designated domestic or pet animal is valid," "[t]he intended use of the principal or income may be enforced by an individual designated for that purpose in the trust instrument," and the "trust

shall terminate when the living animal beneficiary or beneficiaries of such trust are no longer alive."  EPTL § 7-8.1(a).

There are several provisions of the statute, however, that, taken together, provide strong textual evidence that the legislature contemplated that such trusts would take effect only upon the death of the pet owner.  First, subsection (c) provides that "[u]pon termination [which occurs 'when the living animal … beneficiaries of such trust are no longer alive'], the trustee shall transfer the unexpended trust property as directed in the trust instrument or, if there are no such directions in the trust instrument, the property shall pass *to the estate of the grantor*."  EPTL § 7-8.1(c) (emphasis added).  Underlying this provision is an assumption that the grantor would be dead upon termination of the trust.  Otherwise, one would expect the drafters to have provided that the property would pass, upon termination of the trust, *either* to the grantor *or* to his or her estate.  They could easily have done so.  *Compare* Conn. Gen. Stat. § 45a-489a (Connecticut statute, which expressly permits both testamentary *and inter vivos* trusts for the care of pets, providing that "[t]rust property not required for its intended use, including trust property remaining upon termination of the trust, shall be distributed … (3) [t]o the settlor, if then living; (4) [p]ursuant to the residuary clause of the settlor's or testator's will; or (5) [t]o the settlor's or testator's heirs ….").  Because the purpose of the New York statute is to carry out the grantor's wishes by creating a lawful trust to serve as the receptacle for funds or other property to be used to care for a cherished animal, it would be strange for the drafters to fail to make any provision for the return of the funds or other property to the grantor upon the animal's death if the drafters' intent was that the trust would be effective during the grantor's lifetime.  Such an omission might operate to deny a living grantor the return of property placed in a trust after the purposes of the trust had expired – which would be in derogation of the common law.  *See* EPTL § 7-2.2 ("When

16

the purpose for which an express trust is created ceases, the estate of the trustee also ceases.");
Restatement (Third) of Trusts § 8 (2003) ("Where the owner of property makes a donative
transfer and manifests an intention that the transferee is to hold the property in trust but the
intended trust fails in whole or in part, or the trust is or will be fully performed without
exhausting or fully utilizing the trust estate, the transferee holds the trust estate or the appropriate
portion or interest therein *on resulting trust for the transferor*….") (emphasis added).  It is well
established that "the courts will not construe a statute as abolishing a common-law right in the
absence of a clear intent on the part of the Legislature."  *Ellington Constr. Corp. v. Zoning Bd. of
Appeals*, 77 N.Y.2d 114, 123 (1990).

Further textual evidence of the legislature's intent that trusts under the statute take effect
only after the death of the grantor appears in subsection (e), which provides that "[i]f no trustee
is designated or no designated trustee is willing or able to serve, a court shall appoint a trustee
and may make such other orders and determinations as are advisable to carry out the intent of the
transferor and the purpose of this section."  EPTL § 7-8.1(e).  This provision, which functions
much like common law doctrines requiring a court to carry out a testator's intent after his or her
death, *see* Restatement (Third) of Trusts § 34(2) ("If the appointment of a trustee is not provided
for or made pursuant to the terms of the trust, the trustee will be appointed by a proper court."),
would presumably be unnecessary if the grantor was alive to appoint a trustee or a replacement
trustee, or to make known his or her intent to the court.

Nonetheless, the text of the statute does not definitively preclude the possibility of an
*inter vivos* trust, and thus the Court examines the statute's legislative history for further evidence
of the underlying legislative intent.  *See Oklahoma v. New Mexico*, 501 U.S. 221, 234 n.5 (1991)
("[W]e repeatedly have looked to legislative history and other extrinsic material when required

to interpret a statute which is ambiguous"); *People v. Ballman*, 15 N.Y.3d 68, 72 (2010)
("[W]here the language [of a statute] is ambiguous, we may examine the statute's legislative
history" (internal quotation marks omitted)).  The available legislative history provides further
evidence that the statute was enacted to permit pet owners to create trusts for the care of their
pets only after the owners' deaths.  For instance, the Sponsor's Memorandum attached to the bill
that later became EPTL § 7-6.1 states that the purpose of the proposed bill was "[t]o enable a
pet-owner to provide for the animal's care *after the owner dies*."  Sponsor's Mem. Bill Jacket, L.
1996, ch. 159 (emphasis added).  In letters supporting the bill, the sponsors repeated that the
bill's purpose was to allow pet owners to set up trusts to care for their animals "after the owner
dies."  Letter of Sen. Norman J. Levy, dated June 7, 1996, Bill Jacket, L. 1996, ch. 159; Letter of
Assemb. Michael C. Finnegan, dated June 10, 1996, Bill Jacket, L. 1996, ch. 159.  Moreover, the
Sponsor's Memorandum explains that the rationale for the proposed bill was that "New York
State law does not allow a pet owner to leave any part of his or her *estate* directly to benefit an
animal."  Sponsor's Mem. Bill Jacket, L. 1996, ch. 159 (emphasis added).

    The Court notes that a New York City Bar Association letter supporting a 2010
amendment to EPTL § 7-8.1 makes reference to the possibility of an *inter vivos* animal trust.  *See*
Letter of the New York City Bar Association, dated Nov. 2008, Bill Jacket, L. 2010, ch. 70.  The
2010 amendment, however, made only a minor change to measure the duration of the trust based
on the animal's life instead of 21 years; it was thus not an occasion to reexamine the validity or
scope of these trusts in general.  The Bar Association letter also post-dates the enactment of the
statute as a whole by over a decade; such *post*-enactment legislative history is of little or no
weight when determining the legislature's *pre*-enactment intent.  *See Bruesewitz v. Wyeth LLC*,
131 S. Ct. 1068, 1082 (2011) (noting that post-enactment legislative history is given little or no

weight when determining the legislature's intent because "by definition [it] could have had no effect on the congressional vote" (internal quotation marks omitted)); *Civil Servs. Emps. Assoc., Inc. v. Cnty. Of Oneida*, 78 N.Y.S.2d 907, 909 (N.Y. App. Div. 1980) ("[P]ostenactment statements or testimony … is irrelevant").  The pre-enactment legislative history supports the conclusion that the drafters of EPTL § 7-6.1 intended the statute to apply only upon the death of the pet owner.

The only two references to this issue in case law located by the Court also support this interpretation, although neither bears much weight because neither specifically addressed the question whether the statute permits the creation of an *inter vivos* trust.  In *Feger v. Warwick Animal Shelter*, 870 N.Y.S.2d 124 (N.Y. App. Div. 2008), the New York Appellate Division, Second Department considered whether an adoptive pet owner's identity should be revealed to a putative prior owner of the adopted animal.  In its discussion of New York's "longstanding history of protecting animals," the court noted that New York "law now recognizes the creation of trusts for the care of designated domestic or pet animals *upon the death or incapacitation of their owner*."  *Id.* at 126-27 (emphasis added).  *Feger* favors this Court's interpretation of EPTL § 7-8.1 as barring *inter vivos* trusts (except, perhaps, where the grantor is incapacitated, which is not the case here).  In *In re Fouts*, the New York Surrogate's Court in Nassau County considered a petition to transfer the situs of an *inter vivos* trust, which was created under EPTL § 7-6.1 to provide for the care of five chimpanzees.  *In re Fouts*, 677 N.Y.S.2d 699 (N.Y. Sur. Ct. 1998).  Although that case involved an *inter vivos* animal trust, the Court did not address whether the statute authorizes such a trust, because the issue was not raised.[12]  *Id.* at 700.

---

[12] To the extent that *Fouts* can be read to permit an *inter vivos* trust, *Feger* controls because the New York Appellate Division, Second Department has appellate jurisdiction over the Surrogate's Court in Nassau County.

Based on the statutory language, legislative history, and available case law, the Court concludes that EPTL § 7-8.1 does not provide for the creation of an *inter vivos* trust for the care of animals.  Because the grantor, Ms. Chapman-Avery, is living, the Trust is void under New York law.  An invalid trust is not a recognizable legal entity, and the trustee therefore lacks a legally protected property interest and lacks standing.  *See Hanson v. Denckla*, 357 U.S. 235, 247 n.16 (1958) (where a trust is invalid, the trustee has no legal interest, only the settlor does); *Kinzel v. Bank of Am.*, No. 3:10-cv-02169, 2013 U.S. Dist. LEXIS 39608, at *17 (N.D. Ohio Mar. 13, 2013) (noting that "trustees of a void trust would not have standing" to bring a claim concerning an interest existing solely as a result of the void trust).

### C.    The Plaintiff's Remaining Motions Are Denied

Because the Plaintiff lacks standing, the Court lacks jurisdiction to decide the remaining motions on their merits.  *See Ex parte McCardle*, 74 U.S. 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").  The Plaintiff's remaining motions are therefore denied.

## III.    Conclusion

The Defendants' Motions to Dismiss based on standing [Dkt. # 19, 36, 44] are GRANTED.  The Defendants' Motion to Dismiss on grounds other than standing [Dkt. # 42] is DENIED as moot.  The Plaintiff's Motions for Extension of Time [Dkt. # 58] and for Leave to Amend [Dkt. # 62] are DENIED.  The Clerk is directed to close this case.

IT IS SO ORDERED.


_____/s/_____

Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                June 14, 2013